EDITH KERWIN, ADMINISTRATRIX, APPELLANT, V. THOMP-
SON, BELDEN & COMPANY ET AL., APPELLEES.

FILED APRIL 21, 1923.    No. 22275.

1. **Municipal Corporations:** BUILDING ORDINANCE NOT RETROACTIVE.
A city ordinance which requires all elevator shafts in all fire-proof
buildings erected after the passage of the ordinance to be in-
closed in fire-proof partitions is not retroactive so as to apply to
buildings erected before the passage of the ordinance.

2. **Negligence:** MAINTENANCE OF ELEVATOR SHAFT. The maintenance
of an elevator shaft built before the passage of the ordinance
without being so inclosed is not such a violation of a legal duty as
to give rise to an implication of negligence, because of the ordinance.

3. ———: EXPOSURE TO KNOWN DANGER. A person who knowingly
and of his own volition exposes himself to an obvious danger
cannot recover damages for any injury which he might have avoided
by the use of reasonable care.

4. ———: PRESUMPTION. Where there was no witness to an accident
causing death, the presumption is, in the absence of evidence to the
contrary, that decedent exercised due care; but this presumption is
rebutted when the circumstances proved show that decedent was
negligent.

5. ———: CONTRIBUTORY NEGLIGENCE. Evidence examined, and *held* in-
sufficient to show that defendants were guilty of negligence, and,
further, that the death of decedent was caused by his own negligence.

APPEAL from the district court for Douglas county:
WILLIAM A. REDICK, JUDGE. *Affirmed.*

*Crofoot, Fraser, Connolly & Stryker,* for appellant.

*Switzler, Ringer, Switzler & Shackelford* and *Gurley,
Fitch & West,* contra.

Heard before MORRISSEY, C. J., LETTON, ALDRICH and
DEAN, JJ., RAPER, District Judge.

RAPER, District Judge.

Action by plaintiff as administratrix to recover dam-
ages for negligence in causing the death of her husband,
Albert Kerwin. At the close of plaintiff's testimony
the court excused the jury and dismissed the case.

The proof established that about 1905 defendant
Hoagland erected a building and leased same to defend-

aut Thompson, Belden & Company. An elevator was installed in the building soon after its erection. The shaft of the elevator was protected by a wire mesh or grating up to about seven feet from the floor, and from the top of this mesh to the ceiling, about six or seven feet, the shaft was unguarded. Several years before the date in question, Thompson, Belden & Company procured the American District Telegraph Company to install and keep in repair a night watch and fire and burglar alarm. This alarm system also included several other large business buildings. The wires for this alarm system in the Hoagland building were run up the elevator shaft, and on the second floor the wires left the elevator shaft at the top of the wire mesh and ran around the walls to a clock, where watchmen were required to periodically register, and thus give notice of their presence to the A. D. T. Company central office. A short time before the day of the accident Thompson, Belden & Company in making some alterations on the second floor of the building by way of new shelving, had caused the wires running to the clock to be disengaged from their usual place and some new shelving to be built against the wall. This shelving was constructed up to the elevator shaft; the top was about two or three feet wide and six feet above the floor. The wires that had been loosened were laid on top of this new shelving, and there is some evidence that might indicate that the wires in the elevator shaft had at one time been fastened to the wall of the elevator shaft but had become loosened. The owner of the building had no knowledge of the installation of the alarm system. The A. D. T. Company located and installed the wires without the location being designated by Thompson, Belden & Company; the A. D. T. Company placing the wires and apparatus where it deemed advisable. The deceased, had been employed about three years by the A. D. T. Company as a "trouble shooter." In case of trouble on a line the chief operator would send out a "trouble shooter," whose duty it was to test

the lines and locate the break or source of the trouble. A "trouble shooter" in his efforts to locate a break or trouble would go to any place on the line where he might desire, and the process of testing was to cut one of the three insulated wires that formed the connecting circuit and open it up at the end, then, when test was made, twist the ends together again and put tape around it. That was what they called a test station. It was not the custom of these linemen to notify the people in any of the buildings when the "trouble shooter" went to make a test. On two occasions somewhere around spring or fall prior to the day in question the deceased went with another lineman and made tests of the system in the Thompson, Belden & Company Store, these tests, as a matter of convenience, were made near the elevator shaft.

In 1914, after the erection of the building, and the elevator shaft, the official building code of the city of Omaha was enacted by the city council. This code required all fire-proof buildings "hereafter erected" to have elevator shafts inclosed in fire-proof partitions, extending from the street level to the top of the building, and by another section provided that no wires, except such as necessary to operate or light the elevator, should be placed in the shaft of any elevator; declared such wires a nuisance, and required their removal on 30 days notice by the building inspector.

About 10:30 o'clock on the morning of January 3, 1920, deceased went to the second floor of the Thompson, Belden & Company store to test the circuit, and a descending elevator cage struck him on the top of the head producing almost instant death. No one saw the accident, and the manner of his death must be deduced from the circumstances. At that time the place was well lighted. The elevator was running in the usual manner, and by looking at the wire cables it could be plainly seen whether the elevator cage was below or above the place. The deceased did not tell any one in the building of his presence or purpose, and no

notice was given Thompson, Belden & Company, or the person operating the elevator, or any of their employees, of the presence or purpose of deceased. There was a counter about three feet high a short distance in front of the newly-placed shelving above referred to. Deceased probably got on this counter, and from there climbed to the top of the shelving against the wall, unwrapped and cut one of the wires about six or eight inches from the point where the wires left the elevator cage, evidently to make a test of the circuit. The elevator cage was descending in the usual manner, when it came to a stop, rattled and felt as though it was wedged, Then the man's head was seen wedged between the side of the elevator carriage and the grating, the body extending along the top of the wall case or shelving. There was a space of about six inches between the grating and the side of the elevator. The testimony indicates that deceased probably would be kneeling while making test of the wires.

Appellant alleges that there is sufficient evidence to require the submission of the case to the jury, and that the court erred in refusing to do so. The negligence alleged is the failure of the defendants to inclose the elevator shaft from the floor to the ceiling; and permitting the wires of the A. D. T. Company signal system to be placed in the elevator shaft; that the wires were taken down from their former location and the new shelving placed so as to require the lineman to work near the open elevator shaft; that defendants knew, or should have known, that A. D. T. would work at the place of the accident, and that each and all of these alleged acts of negligence required the submission of the case to the jury. The petition sets out the alleged acts of negligence in great detail, but the foregoing appears sufficient to cover all that is necessary. The district court found that "the unfortunate death of the deceased was brought about by his own act of negligence in allowing a portion of his body to be in this elevator shaft

where he must have known that the elevator was running up and down, and there is no legal liability on either defendant in this case."

Strong emphasis is placed by appellant on the alleged violation of the Omaha ordinance, the building code, which, it is claimed, constitutes negligence *per se,* and the principle announced in *Stevens v. Luther,* 105 Neb. 184, is invoked, that the failure to perform a mandatory and affirmative duty imposed upon owners of property by statutes and ordinances is negligence *per se,* and if any person to whom the duty is owed, or for whose protection the law was enacted, is injured in consequence of such violation, a case is made. Taking up, first, the provision of the ordinance which forbids the placing of wires in an elevator shaft. Under the terms of the ordinance such wires are directed to be removed on notice. There is no proof of notice to either defendant to remove them, and for that reason appellees insist that no negligence can be imputed to them. But, aside from the question of the legal duty, if any, resting on the defendants, or either of them, by virtue of the ordinance, there does not seem to be any relation between the position of the wire in the elevator shaft and the injury to deceased. However glaring an infraction of the ordinance may have been committed or permitted by the defendants, unless the placing of the wires contributed to cause the death, the defendants, of course, are not answerable for it. Nowhere does it appear in the evidence, either by direct testimony or by any reasonable inference from the proved facts, that deceased was injured because the wires ran up the elevator shaft. The mere fact that the test station by deceased's own choice was made near the elevator shaft does not tend to prove that the location of the wires in the elevator shaft had any direct relation to the accident. Deceased was not required to work near the elevator shaft. He chose the place of work. As a convenience to himself he selected the place near the elevator. Neither of the defendants

nor their employees knew of his presence, or that he intended to work, or where he might choose as a place to test the wires. No circumstances were developed which indicate that the wires in the elevator shaft required his attention. His choosing a place to work near the elevator is far from proving that the fact of the wires being in the elevator contributed in any way to the injury.

The building was erected by defendant Hoagland and occupied by Thompson, Belden & Company before the ordinance was enacted. The ordinance does not include buildings already erected, where it provides for the manner of inclosing elevator shafts; the wording being: "In all fire-proof buildings hereafter erected, all elevators, whether passenger, freight or dumb-waiter elevators, shall be inclosed in fire-proof partitions," etc. It is probable that the main purpose of these provisions was to guard against the spread of fires, but whether it was for that purpose or to prevent persons from being injured, or both, we need not stop to consider. The ordinance by its plain terms does not apply to the building in question, so it lacks the requisite legislative "mandatory and affirmative" or compulsory obligation to place it within the rule announced in *Stevens v. Luther, supra.* Furthermore, it may be said of the elevator shaft, as has been said of the wires, that nothing appears in the evidence that indicates any necessity "for the deceased to work in the elevator shaft, or even near it. The shelf on top of the wall case was two or three feet wide, giving safe and ample room for deceased to work. He knew, or must have known, that the elevator was being continuously operated, and could definitely tell whether the cage was above or below him, and to place his head in the shaft below a descending elevator would be extremely hazardous. It follows that the maintaining of the elevator shaft was not the proximate cause of accident.

Appellant urges the rule that the presumption is, in

the absence of eye-witnesses, that at the time the deceased was killed he was in the exercise of ordinary care. This presumption, however, is rebutted whenever the evidence shows the situation to have been such that deceased, if he had looked, would have realized the danger and avoided it.   The evidence is clear that deceased was no more than a licensee of the lessee of the building; that he went on the premises to perform a duty for his master; that he did not inform any of the defendants or their employees of his presence or intended work; that he voluntarily chose the place of his work near the elevator shaft; that the place where he did choose to work was reasonably safe; that no part of his duties required him to place his body in the elevator shaft; that, even if he found it necessary to look into the shaft, the danger attending such act was so obvious as to conclusively overcome the legal presumption of due care on his part.

The trial judge rightfully held that the deplorable accident was due wholly to the negligence and fault of the deceased, and the judgment of dismissal must be

AFFIRMED.